## Case No. 16,004.

UNITED STATES v. The PARYNTHA DAVIS.

[3 Ware, 159.] [1]

District Court, D. Maine. July, 1858.[2]

SHIPPING—COD FISHERIES—BREACH OF LICENSE—TAKING MACKEREL.

1. The fishing business is a trade within the meaning of the license act of Feb. 18. 1793 [1 Stat. 305]. The meaning of the word "trade" in the act, is equivalent to "employment," and every act of trade beyond the scope of the license subjects the vessel to forfeiture under the 32d section of the act.

2. Since the act of May. 1828 [4 Stat. 312], authorizing a special license for the mackerel fishery, that is a trade distinct from the cod fishery.

3. A vessel with a cod-fishing license may take mackerel for bait, or for the consumption of the crew, but if she engages in this fishery as a business, she is liable to forfeiture.

In admiralty.

Mr. Shepley, U. S. Dist. Atty.
B. F. Hallett, for claimants.

WARE, District Judge. This was a libel in rem for a forfeiture. The schooner was regularly licensed on the 22d of September, 1857, in the collection district of Barnstable, in Massachusetts, for carrying on the cod fisheries, and on the 11th of October was seized, while lying in Hog Island Roads, in Portland, where she had gone to make a harbor, and for water, on a charge of being engaged in a trade other than that for which she was licensed. It was proved at the hearing, that the schooner took out a cod-fishing license the 27th of March, and was employed under that till the 23d of July, when it was surrendered, and a license taken for the mackerel fishery. This was held until the 22d of September, when it was surrendered and another license for the cod fisheries taken. It was while she held this license that she was seized on the

1 [Reported by George F. Emery, Esq.]
2 [Affirmed in Case No. 16,003.]

11th of October. The schooner sailed from Wellfleet on the 22d of September, completely equipped for the cod fishery, as is stated by the witnesses for the claimants. and as appears from other testimony, as well prepared for the mackerel fishery; and after stopping at Townsend over Friday night, sailed for the east Saturday morning. She tried for cod on the way, but took none, and went into Wellfleet Saturday night and lay there over Sunday. Monday she went to Long Island and remained there and in the waters about there about three days, trying for cod, but took very few, but she took two or three barrels of mackerel for bait. Thursday she went west without fishing, and stopped at Fox Island at night. There she was detained by the state of the weather the next day. Saturday she continued her westward course, and once in the forenoon and once in the afternoon tried the codfish, but found none. While fishing for cod a school of mackerel came to the top of the water, and three or four barrels were taken for bait. At night they went into Townsend and remained there over Sunday. Monday she went out and tried for cod about Damariscotta, but caught not more than half a dozen, and left for Seguin, and she caught a barrel of mackerel for bait. Leaving Seguin Tuesday they were off Portland trying for cod without taking more than half a dozen, but they took half a barrel of mackerel. They remained on this fishing-ground, fishing for codfish in the day time, and lying to at night. They got very few cod, but one day took three or four wash-barrels of mackerel. While they were seeking for cod, mackerel from time to time came to the surface of the water, and then a few were taken for bait. Saturday two or three codfish were taken, and three or four barrels of mackerel. Saturday evening they went to Portland for a harbor and a supply of water. Sunday morning the vessel was visited by the boat of the revenue cutter Caleb Cushing, and on an examination of the schooner her license was taken away, and Monday the vessel was seized. Such, in substance, is the account, given by Lombard, one of the crew, of the vessel's employment from the time that she took out her license in September, until she was seized on the 11th of October. The depositions of two others of the crew were produced at the hearing, but their statements do not materially vary from that of Lombard.

The allegation in the libel on which a forfeiture is claimed, is founded on the 32d section of the act of February, 1793, commonly called the "License Act." The act provides generally for the licensing and regulating of vessels to be employed in the coasting trade and fisheries, and the section mentioned has a provision that if any licensed vessel shall be "employed in any other trade than that for which she is licensed, she shall be forfeited." At the time of the passage of this act, and down to the year 1828, the law provided but two forms of fishing licenses, one for the cod and the other for the whale fisheries. All the bank and coast fisheries were carried on under a cod-fishing license. But by that time the mackerel fishery had grown up to an important branch of business, and a special license was provided for that trade. A case arose in this district soon after the passage of the act of 1828, which involved the consideration of the construction and effect of that law. In that case it was held that the fishing business was a trade within the true intent and meaning of the 32d section of the license act of 1793. And that since the act of 1828, providing a special license for the mackerel fishery, that by itself constituted in a legal sense a trade separate and distinct from cod fishing, and required a special license to protect the vessel from the penalty of the law, and that when a vessel under a cod-fishing license engaged in the mackerel fishery as a business, she was employed in another trade than that for which she was licensed, and thereby became liable to forfeiture. That case was carried by appeal to the circuit court, and the decision was then affirmed, and it has been considered as settling the law on this subject. The Nymph [Cases Nos. 10,388 and 10,389]. Some doubt was indeed thrown over the doctrine of that case by the subsequent case of The Reindeer [Id. 16,145]. A doubt was then suggested, whether, as the cod and mackerel fishing business were both of the same generic nature, they could properly be considered as distinct and different trades. But it was expressly added by the court, that it was not its intention to overrule the case of The Nymph [supra]. The Nymph was under a cod-fishing license, and it was shown by the evidence that about one-half of her time she had employed in cod fishing, and the other half in taking mackerel. It was a case of mixed employment. But it is well-settled by a series of decisions, that any engagement in an unauthorized trade, any employment of the vessel beyond the scope of her license, works a forfeiture. The Active, 7 Cranch [11 U. S.] 100, was the case of a vessel under a fishing license, which was loaded in the night, had left the wharf without a clearance, under circumstances which justified the belief that she was intended for a foreign voyage, and for this she was seized and adjudged to be forfeited. See, also, U. S. v. The Mars [Case No. 15,723]; The Eliza [Id. 4,346]; The Julia [Id. 7,574].

The only question then open in this case, is one of fact. The schooner was under a cod-fishing license, and did she, on her trip commencing Sept. 24th and ending Oct. 11th, engage in the mackerel fishery as a business, or trade, or was she engaged in a mixed

business of cod and mackerel fishing? In either case she is liable to forfeiture. I do not ascribe so much importance to the fact that when taken she had a complete outfit for taking mackerel, for this reason. Her cod-fishing license authorized her to pursue that business in the customary manner, and for that purpose she must have her supply of bait and provisions for the crew, or obtain them in the course of the cruise. And it is the well-known custom of the trade, for vessels in the cod-fishery to supply themselves, in the season of mackerel, with this fish for bait, the fresh mackerel being found to be the best bait for cod. It is also an equally well-known custom for the crew to live, in part at least, on fresh fish. It is not, therefore, a circumstance of suspicion that she had mackerel lines aboard, nor perhaps that she had a full supply for a regular mackerel voyage, as her last trip had been in that fishery. To take mackerel for bait, or for the consumption of the crew, was no violation of the license. The instructions of the treasury department authorize this to be done, and these instructions are in conformity with the previous decisions of the courts. And if, in the course of the trip, it should so happen that somewhat more of mackerel are taken than are consumed in this way, it would be a harsh construction of the law to require the crew to throw overboard a small surplus that may remain, or expose their vessel to forfeiture, provided the cruise had been fairly and in good faith devoted to cod fishery.

The manner in which the crew were employed during the cruise has already been stated from the depositions of three of their number. Part of the time they were employed in fishing for cod, and part of the time in taking mackerel, as the witnesses state, for bait. The proceeds or result of that employment, was shown by the fish found on board the schooner, when she was seized. There was not a single cod found, but there were at least fifteen barrels of mackerel, if not more, for they were not counted. A small part of them were on deck in open wash-barrels, but the greater part were pickled, barreled up, and stowed under deck, as they would be if intended for the market, and not for bait. The cod-lines were put away, but the gear for mackerel-fishery were all rigged and ready for use. On this evidence I find it difficult to be persuaded that the crew had truly, and in good faith, employed themselves in cod-fishing as their exclusive business, and that no part of their time had been occupied in taking mackerel except for bait. I agree with what was said by the court in the case of the Reindeer, that the fishermen are to be considered with indulgence, and even with kindness. They are a hardy, industrious, careful, and highly meritorious class of men at all times, and invaluable to the

country in the times of her greatest need. But there must be limits to this indulgence, and courts of justice are bound to execute the laws.

The unfavorable inferences which not unnaturally follow from the testimony of the claimants, are strengthened and fortified by the evidence offered by the government, of what took place at the time of the seizure. When the skipper was asked how it happened, that being under a cod-fishing license, he had mackerel and not cod, what was the object of his voyage, he answered that it was to take any kind of fish that came in his way, and that he had taken mackerel as he had a right to do. His previous trip had been under a mackerel license, and under that he was authorized by the act of 1836, c. 55, 5 [Stat. 16], to take all kinds of fish. But no such liberty is allowed under a cod license. The reason of the difference is, that the mackerel fishery is encouraged by a drawback of the duty on the salt used, but in the cod fishery, as a substitute for this, a direct bounty is paid for the time employed in proportion to the tonnage of the vessel.

My opinion on the whole evidence is, that this vessel was employed, if not exclusively, at least in part, in taking mackerel, not for bait, or for the ship's use, but as the proper business, in the whole or in part, of the voyage, and that consequently she is liable to forfeiture.

This case was appealed to the circuit court, and there the decree of the district court was affirmed at September term, 1860. [Case No. 16,003.]